# EXHIBIT NO. 1



*CJ-10-8533*
*Dixon*

## IN AND FOR THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

STATE OF OKLAHOMA, ex rel. KIM HOLLAND, )
INSURANCE COMMISSIONER, AS RECEIVER )
FOR PARK AVENUE PROPERTY AND )
CASUALTY INSURANCE COMPANY, )
)
    Plaintiff, )
)
vs. )
)
PROVIDENCE HOLDINGS, INC., )
)
FALCON HOLDINGS, LLC, )
)
JERRY LANCASTER, DEREK LANCASTER )
JAN SCHINDLER, AARON LANCASTER, )
DARON LANCASTER, ROBERT THOMAS, )
DALE SCHMELTZLE )
)
PARK AVENUE INSURANCE, LLC )
)
CHARLES ANTONUCCI )
)
OPPENHEIMER & CO., INC. )
)
ALLEN REICHMAN, and )
)
JOHN BITLOVE, RICHARD CRYSTAL, WILLIAM )
EHRHARDT, MICHAEL KEEHNER, ALBERT )
LOWENTHAL, KENNETH MCARTHUR, A. WINN )
OUGHTRED, ELAINE ROBERTS, BURTON )
WINBERG )
)
    Defendants. )

**CJ - 2010 - 8533**

Case No. _____

Judge _____

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

OCT 19 2010

PATRICIA PRESLEY, COURT CLERK

by _____
               DEPUTY

## PETITION

The State of Oklahoma ex rel. Kim Holland, Insurance Commissioner, as Receiver for

Park Avenue Property and Casualty Insurance Company, brings this lawsuit against the named

Defendants due to their causing the failure of Park Avenue, an Oklahoma domiciled insurance

company. Through individual acts of negligence, errors and omissions as to their respective

1

fiduciary roles, and through a conspiracy to loot the insurance company and violate the laws of the State of Oklahoma, the named Defendants are directly responsible to the Plaintiff for the damages caused by their acts.  In further support of the Plaintiff's claims, Plaintiff shows the following:

<b>PARTIES AND JURISDICTION</b>

1.    Park Avenue Property and Casualty Insurance Company ("Park Avenue"), formerly Providence Property and Casualty Insurance Company[1], is an Oklahoma corporation in Liquidation under the direction of Kim Holland, Commissioner of Insurance for the State of Oklahoma and the District Court in and for Oklahoma County, State of Oklahoma.

2.    Park Avenue is a wholly owned subsidiary of Park Avenue Insurance, LLC ("PAI"), which is owned 100% by Charles Antonucci ("Antonucci").  On Friday, October 8, 2010, Antonucci pled guilty to a conspiracy/scheme with others wherein he agreed to purchase Park Avenue by fraudulent means by the unlawful use of Park Avenue's own assets to leverage the transaction.  Antonucci's plea also included his admission that he caused false information regarding the purchase of Park Avenue to be submitted to the OID; misrepresented his net worth; and caused Park Avenue to submit a false financial statement to the OID.

3.    Park Avenue was a wholly owned subsidiary of Providence Holdings, Inc. ("PHI") at relevant times herein.

4.    PHI is owned 75% by Falcon Holdings, Inc. and 25% by Derek Lancaster.  Falcon Holdings, LLC, is, in turn, owned 61% by Jerry Lancaster and 13% each by Aaron Lancaster, Daron Lancaster, and Jan Schindler.

---

[1] After the sale of Providence Property and Casualty Insurance Company to PAI, PAI changed the name of Providence to Park Avenue Property and Casualty Insurance Company.  For purposes of this Petition, the insurer Providence/Park Avenue will be referred to as "Park Avenue".

5.      Jerry Lancaster is a resident of Texas. Jerry Lancaster was an owner of PHI and Chairman of Park Avenue at all times relevant to this litigation.

6.      Aaron Lancaster is a resident of Texas. Aaron Lancaster was an owner of PHI at all times relevant to this litigation.

7.      Daron Lancaster is a resident of Texas. Daron Lancaster was an owner of PHI at all times relevant to this litigation.

8.      Derek Lancaster is a resident of Texas. Derek Lancaster was an owner of PHI and President and Chief Executive Officer of Park Avenue at all times relevant to this litigation.

9.      Jan Schindler is a resident of Texas. Jan Schindler was an owner of PHI and Executive Vice President of Park Avenue at all times relevant to this litigation.

10.     Oppenheimer & Company, Inc. ("Oppenheimer") is a registered broker-dealer and investment advisory corporation doing business in Oklahoma.

11.     John Bitlove was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

12.     Richard Crystal was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

13.     William Ehrhardt was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

14.     Michael Keehner was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

15.     Albert Lowenthal was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

16.     Kenneth McArthur was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

3

17.     A. Winn Oughtred was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

18.     Elaine Roberts was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

19.     Burton Winberg was a member of Oppenheimer's Board of Directors at all times relevant to this litigation.

20.     Allen Reichman ("Reichman") was an Executive Director of Investments at Oppenheimer at all time relevant to this litigation.

21.     Robert Thomas was Vice President and General Counsel for PHI and Park Avenue at times relevant to this litigation.

22.     Dale Schmeltzle was Vice President and Chief Financial Officer for PHI and Park Avenue at times relevant to this litigation.

23.     Venue and jurisdiction are proper.


### FACTUAL HISTORY

24.     Park Avenue is an insurer that dealt mostly in large deductible workers' compensation policies in the Professional Employer Organization industry.

25.     On October 22, 2008, PAI and PHI entered into a Stock Purchase Agreement wherein PAI was to purchase Park Avenue from PHI for an aggregate price of $37.5 million.

26.     Under Oklahoma law, any change of ownership of or control over an Oklahoma domiciled insurance company must first be preapproved by the Oklahoma Insurance Department ("OID"). To obtain approval, the seller and buyer must submit a Form A Application (Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer) ("Form A") to the OID for review and approval by the Insurance Commissioner. The Form A provides

4

notice to the OID of the proposed transaction and provides certain required information to the OID to allow the Insurance Commissioner to evaluate and approve or reject the transaction. The Form A required the parties to disclose all sources of financing for the transaction.

27.     On November 14, 2008, PHI and PAI submitted a Form A to the OID. PHI and PAI, through the Lancasters and Antonucci, misrepresented to the OID in the Form A that the transaction was being financed by Park Avenue Bank.

28.     At the time, Antonucci was the President and majority shareholder of Park Avenue Bank. The Lancasters, Schindler, Thomas, Schmeltzle, Antonucci, Reichman and Oppenheimer all knew that Park Avenue Bank was not and, due to regulatory restrictions, could not finance the transaction for PAI, and that Oppenheimer was the true, yet undisclosed, source of the majority of financing for PAI's purchase of Park Avenue.

29.     Antonucci, PAI, Reichman and Oppenheimer intended for PAI to use Park Avenue's bond portfolio as collateral for the financing to be provided by Oppenheimer.

30.     PHI, the Lancasters, Schindler, Schmeltzle, and Thomas all knew or should have known that Antonucci, PAI, Reichman and/or Oppenheimer intended to use Park Avenue's bond portfolio as collateral for the financing for PAI's purchase of Park Avenue.

31.     All Defendants herein either misrepresented to, or concealed from, the OID the true source of the financing for PAI's purchase of Park Avenue. All Defendants also misrepresented or concealed the intent of Antonucci, PAI, Reichman and Oppenheimer to use Park Avenue's bond portfolio as collateral for such financing.

32.     On January 29, 2009, a hearing on the Form A was held at the OID. Following the presentation of testimony and evidence, the OID, relying on misrepresented facts, entered an Order approving the change of control over Park Avenue from PHI/Lancasters to

5

PAI/Antonucci. The closing date of the purchase and sale of Park Avenue to PAI was the next day, January 30, 2009.

33.     At the time of the sale, Park Avenue's single largest asset was its bond portfolio, valued at year end 2008 at approximately $55 million.

34.     Prior to the January 30, 2009 closing date, the Lancasters and Antonucci worked directly with Reichman to have Oppenheimer loan the money to PAI to purchase Park Avenue.

35.     PAI, Antonucci and Reichman planned to use Park Avenue's bond portfolio as collateral for Oppenheimer's margin loan to PAI, in violation of Oklahoma law.

36.     Although Oppenheimer was to make the loan to PAI (who was the buyer), Oppenheimer and Reichman communicated and negotiated mostly with the PHI and the Lancasters (who were the sellers).

37.     Park Avenue previously maintained its bond portfolio with Wells Fargo & Company in Dallas, Texas ("Wells Fargo") before the transaction with PAI. In the weeks prior to the closing date, Oppenheimer and Reichman instructed the Lancasters that the Park Avenue bond portfolio had to be transferred from Wells Fargo to Oppenheimer, where PAI had an account, prior to the closing date as a "condition precedent" to Oppenheimer making the loan to PAI.

38.     The purpose of the pre-closing transfer of the bond portfolio to Oppenheimer was so that Oppenheimer would be in possession of the bond portfolio at the time of closing, thereby allowing Oppenheimer to use the bond portfolio as collateral immediately after Park Avenue was sold to PAI.

39.     On January 22, 2009, the Lancasters transferred Park Avenue's bond portfolio from Wells Fargo to Oppenheimer. Oppenheimer then became the custodian of the full $55

6

million Park Avenue bond portfolio, and, using Park Avenue's own assets as collateral, was able to loan PAI the money to pay the Lancasters for the purchase of Park Avenue.

40.     The Lancasters, Antonucci and Oppenheimer, through Reichman, reasoned that, once the closing was complete, PAI would own Park Avenue, and PAI could then allow Oppenheimer to use Park Avenue's bond portfolio as collateral for the purchase loan.

41.     The closing of the sale of Park Avenue occurred on January 30, 2009.  That same day, the following transactions occurred:

       a.     Oppenheimer changed the title to the entire bond portfolio from Park Avenue to PAI.  Park Avenue received no consideration from PAI for the transfer of the bond portfolio.

       b.     Oppenheimer loaned PAI $30 million to pay part of the $37.5 million purchase price.

       c.     Oppenheimer's Client Agreement with PAI expressly stated that Oppenheimer would margin the bond portfolio as collateral for any loan made by Oppenheimer to PAI.  Therefore, when the closing was completed and Oppenheimer loaned PAI the $30 million, Oppenheimer immediately collateralized the loan with Park Avenue's bond portfolio, encumbering every bond in the portfolio in accordance with the margin provisions of Oppenheimer's Client Agreement.

       d.     Next, PAI transferred $30 million from PAI's Oppenheimer account to PAI's account at Park Avenue Bank.

       e.     Antonucci also transferred $7.5 million from another account at Park Avenue Bank into the PAI account at Park Avenue Bank.

f.      Then, still that same day, PAI used the total of $37.5 million that had been

transferred into its account at Park Avenue Bank to pay the Lancasters

for the purchase of Park Avenue, thus completing Park Avenue's

purchase using Park Avenue's own money.

42.      Oklahoma's Insurance Holding Company Systems Act requires that certain transactions between insurance companies and their affiliated companies must be pre-approved in writing by the Insurance Commissioner.

43.      At the time Oppenheimer changed title of the bond portfolio from Park Avenue to PAI, Park Avenue was owned and controlled by PAI, and Park Avenue and PAI were "affiliated companies" for purposes of Oklahoma's Insurance Holding Company Systems Act.

44.      The transfer of Park Avenue's bond portfolio to PAI was a transaction between affiliated companies that, pursuant to the Insurance Holding Company Systems Act, required pre-approval in writing from the Insurance Commissioner.

45.      None of the entities or persons involved – PAI, PHI, Park Avenue, the Lancasters, Antonucci or Oppenheimer – obtained the requisite written pre-approval from the Insurance Commissioner.  The transfer of the bond portfolio from Park Avenue to PAI was therefore a violation of Oklahoma law.

46.      OKLA. STAT. tit. 36,  § 1926(A) of the Oklahoma Insurance Code defines certain types of transfers and obligations to be "fraudulent" and grants the Insurance Commissioner, as Receiver for insurers in receivership, the power to avoid such fraudulent transfers.

47.      Under § 1926(A), the transfer of the bond portfolio from Park Avenue to PAI constituted a "fraudulent transfer" that is avoidable because Park Avenue received no consideration for the loss of its bond portfolio.

8

48.     Exercising her powers provided in Okla. Stat. tit. 36, § 1926(A), the Receiver avoided the fraudulent transfer of Park Avenue's bond portfolio to PAI. On February 8, 2010, the Receivership Court entered an Order of Approval of Notice of Avoidance, thereby approving the avoidance of the fraudulent transfer of the bond portfolio from Park Avenue to PAI.

49.     The Receiver provided notice to Oppenheimer advising that the transfer of Park Avenue's bond portfolio to PAI had been avoided and that Oppenheimer's use of the bond portfolio as collateral for a loan to PAI was improper and void. The Receiver demanded Oppenheimer to return the entirety of the bond portfolio. The notice to Oppenheimer constituted notice to each of Oppenheimer's Board of Directors and Officers.

50.     Oppenheimer, with the knowledge of its Board of Directors, refused to return the ill-gotten monies to the Receiver. Instead, Oppenheimer continued to hold the remaining assets and liquidated the assets to pay itself back for the loan to PAI, all in direct contravention of Park Avenue's ownership rights in the bond portfolio.

51.     Only after Oppenheimer finished paying itself back did it return what remained of Park Avenue's bond portfolio. Of the $55 million worth of assets taken by Oppenheimer, it returned only slightly more than $7.9 million to Park Avenue.

52.     Oklahoma law requires all Oklahoma insurers to maintain a mandatory minimum surplus. The mandatory minimum surplus for Oklahoma insurers is calculated, in part, by consideration of all of the insurer's admitted assets.

53.     Pursuant to Oklahoma's Insurance Code, all collateralized assets must be treated as non-admitted assets. Non-admitted assets cannot be counted for purposes of calculating statutory surplus or compliance with solvency requirements.

54.     When Oppenheimer collateralized the Park Avenue bond portfolio, the entire bond portfolio became a non-admitted asset, and thereby removed approximately $55 million in

9

assets from Park Avenue's admitted assets. As a result, Park Avenue fell below the statutory minimum surplus requirement and was immediately rendered insolvent.

55.    Less than ten (10) months later, on November 13, 2009, the Insurance Commissioner filed an Application for Order of Rehabilitation and Request for Injunctive Relief seeking to place Park Avenue into Receivership due to its insolvency.  On November 18, 2009, a Consent Order of Liquidation With a Finding of Insolvency and Permanent Injunction was entered by the Receivership Court, thereby placing Park Avenue/Park Avenue into receivership. On November 20, 2009, the Receivership Court entered a Final Order of Liquidation and Cancellation of Policies, finding Park Avenue insolvent.

56.    The Insurance Commissioner, as Receiver for Park Avenue, is now charged with marshalling Park Avenue's remaining assets and resolving its debts. The Defendants' acts and omissions caused and/or contributed to the insolvency of Park Avenue.

### NEGLIGENCE & BREACH OF FIDUCIARY DUTIES – OPPENHEIMER & REICHMAN

57.    Oppenheimer holds itself out as having expertise in connection with the insurance industry, including investing and managing insurers' portfolios. Oppenheimer was negligent and breached its fiduciary duties by mishandling the Park Avenue bond portfolio and failing to provide sound advice and guidance.

58.    Oppenheimer and Reichman, as investment advisers, are fiduciaries to their clients.  As such, they have affirmative duties to act in utmost good faith, to fully and fairly disclose all material facts, to employ reasonable care and to ensure that all transactions comply with all applicable laws and regulations.

59.    Oppenheimer and Reichman owed fiduciary duties to Park Avenue to ensure that the transfer of the bond portfolio from Park Avenue to PAI was proper and complied with all

applicable Oklahoma laws and regulations and to ensure that the requisite approval of the transfer from the Commissioner had been obtained prior to the transfer.

60.     Oppenheimer was acting as a fiduciary to Park Avenue with regard to the custody of the bond portfolio.

61.     Oppenheimer was obligated to ensure that the transactions requested by Antonucci and/or Reichman were in the best interest of Park Avenue and in compliance with all applicable laws and regulations.

62.     At an absolute minimum, Oppenheimer was obligated to determine whether the proposed transfer of the bond portfolio from Park Avenue to PAI was permissible under Oklahoma law, and to determine what affect the transfer would have on the solvency of the regulated insurance company, Park Avenue.

63.     Oppenheimer holds itself out as "a leader in public and private financings for insurance companies and in providing expertise in advisory assignments."

64.     Oppenheimer further contends and admits that its professionals are "relied on" by insurance company clients for "ideas and sound advice to address the complexities" of the insurance industry and investment markets.

65.     As a purported leader in financings for insurance companies, Oppenheimer knew or should have known that Oklahoma insurance companies are heavily regulated and extensive disclosure to the OID is required.

66.     Oppenheimer knew or should have known that a significant transaction, such as a complete transfer of a $55 million asset away from the regulated insurance company with no consideration, would require pre-approval from the OID.

67.     Oppenheimer was obligated to be familiar with Oklahoma laws and regulations applicable to transfers of assets between Oklahoma insurance companies and their affiliates

11

and to ensure that any and all transactions relating to Park Avenue complied with such laws and regulations.

68.    As a purported expert in the insurance industry and as an entity doing business with insurance companies in Oklahoma, Oppenheimer knew or should have known that the proposed transfer of Park Avenue's bond portfolio to PAI constituted a transaction with an affiliate that required notice to the Commissioner and prior written approval from the Commissioner.

69.    Oppenheimer failed to ensure that the requisite prior written approval from the Commissioner was obtained.

70.    Oppenheimer knew or should have known that the transfer of Park Avenue's bond portfolio would cause Park Avenue to become instantly insolvent.

71.    Oppenheimer claims to provide "senior level attention throughout the transaction process," which should include, at a minimum, oversight of its employees to ensure that all applicable laws and regulations are considered in relation to each transaction and to ensure compliance with all such laws and regulations.

72.    With the "senior level attention" allegedly provided, Oppenheimer should have monitored the conduct of Reichman and discovered and prevented the illegal transfer of Park Avenue's bond portfolio.

73.    Oppenheimer should have discovered that Reichman had placed his and Oppenheimer's own financial gain in front of the interest of the client, Park Avenue – this is the most basic breach of the fiduciary duties owed by a financial advisor.

74.    At one point, the bond portfolio was going to be transferred to Oppenheimer's sister company, Oppenheimer Trust Company. However, when Oppenheimer Trust Company discovered that the bond portfolio was going to be used as collateral for the loan for the

12

purchase of Park Avenue itself, the Trust Company notified Oppenheimer in writing that custody of the bond portfolio would be handled by Reichman and Oppenheimer and that the Trust Company would have no involvement.

75.     Oppenheimer knew or should have known that Park Avenue's bond portfolio was going to be instantly transferred away to the holding company to be used as collateral. It was Oppenheimer that required the bond portfolio to be transferred to it before the closing. It was Oppenheimer that said its pre-transaction possession of the collateral was a condition precedent to giving PAI the margin loan.

76.     Several months of work, planning and conspiring by Reichman, PAI, PHI, the Lancasters, and Antonucci, along with several weeks of failed oversight by Oppenheimer and its Directors and Officers, resulted in the single-day demise of Park Avenue.

77.     Reichman, Antonucci and the Lancasters concealed the plan to use the bond portfolio as collateral from some of Park Avenue's Officers and the Insurance Commissioner.

78.     On at least one occasion when questioned by a Park Avenue Officer, Reichman falsely claimed that the purpose of the pre-closing transfer of the bond portfolio from Wells Fargo to Oppenheimer was only to allow Oppenheimer to "verify the value of the portfolio", and not to use it as collateral. When pressed by the Park Avenue Officer, Reichman refused to explain further and claimed that the terms of the deal were confidential.

79.     Reichman's and Oppenheimer's negligence and breach of fiduciary duties contributed to Park Avenue's resulting damages, totaling an estimated $102 million[2].

---

[2] This number has been calculated by the Receiver, and includes, but are not limited to, liabilities associated with the loss and LAE reserves, liabilities on the direct business of Park Avenue and the pre-sale Imperial business subject to a reinsurance agreement, case reserves established by the state guaranty associations plus the IBNR estimated by an actuarial expert, and legal and administrative expenses.

## NEGLIGENCE & BREACH OF FIDUCIARY DUTIES – ALL DEFENDANTS

80.    Defendants knew or should have known that PAI intended to use Park Avenue's own assets as collateral for the financing from Oppenheimer.

81.    Antonucci and PAI intended at all times to use Park Avenue's bond portfolio as collateral for PAI's financing from Oppenheimer.

82.    Defendants knew or should have known that the transfer of Park Avenue's bond portfolio to PAI was part of the purchase and sale transaction.

83.    Defendants knew or should have known that the proposed transfer of Park Avenue's bond portfolio to PAI constituted a transaction with an affiliate that required notice to the Commissioner and prior written approval from the Commissioner.

84.    Defendants were negligent by causing, facilitating and/or allowing Park Avenue's bond portfolio to be transferred from Park Avenue to PAI without ensuring that the transfer complied with Oklahoma's laws and regulations.

85.    Defendants made or facilitated the transfer of Park Avenue's bond portfolio from Park Avenue to PAI without notifying the Commissioner or acquiring prior written approval from the Commissioner.

86.    Defendants knew or should have known that Park Avenue was required to maintain a minimum surplus.

87.    Defendants knew or should have known that the bond portfolio was Park Avenue's single largest asset, and by using the bond portfolio as collateral and thereby making it a non-admitted asset, knew or should have known that Park Avenue would fall below the statutory reserve requirements, making Park Avenue instantly insolvent.

14

88.     Defendants were negligent by making or facilitating the transfer of Park Avenue's bond portfolio to PAI and orchestrating the collateralization transaction that rendered Park Avenue insolvent.

89.     As a result of the individual and collective negligence and breaches of fiduciary duties, all Defendants caused and/or contributed to causing Park Avenue to suffer damages of approximately $102 million.

### NEGLIGENCE & BREACH OF FIDUCIARY DUTIES – THE LANCASTERS, SCHINDLER, SCHMELTZLE, THOMAS AND ANTONUCCI

90.     Directors and officers are fiduciaries to a corporation with an affirmative duty of utmost good faith and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care and to ensure that all transactions comply with all applicable laws and regulations.

91.     The Lancasters, Schindler, Schmeltzle, Thomas and Antonucci, as officers and directors of Park Avenue during the pertinent times herein, owed a duty of care and undivided loyalty to Park Avenue.

92.     Under the duty of care, the Lancasters, Schindler, Schmeltzle, Thomas and Antonucci were required to exercise the same degree of care and prudence toward Park Avenue as would be exercised by a reasonable person in a like position under the same or similar circumstances.

93.     The Lancasters, Schindler, Schmeltzle, Thomas and Antonucci owed Park Avenue fiduciary duties to ensure that the transfer of the bond portfolio from Park Avenue to PAI was proper and complied with all applicable Oklahoma laws and regulations, and to ensure that the requisite approval of the transfer from the Insurance Commissioner had been obtained prior to the transfer.

15

94.     The Lancasters, Schindler, Schmeltzle, Thomas and Antonucci each breached these fiduciary duties by transferring and/or facilitating the transfer of the bond portfolio from Park Avenue to PAI without approval from the Insurance Commissioner in violation of Oklahoma's Insurance Holding Company Systems Act.

95.     The Lancasters, Schindler, Schmeltzle, Thomas and Antonucci owed Park Avenue and PAI fiduciary duties to ensure that it was proper and lawful to use Park Avenue's bond portfolio as collateral for Oppenheimer's loan to PAI to purchase Park Avenue, and to ensure that all requisite approval from the Commissioner had been sought and acquired.

96.     The Lancasters, Schindler, Schmeltzle, Thomas and Antonucci breached these fiduciary duties by failing to ensure that the OID was given notice of the proposed transaction Commissioner approval in violation of Oklahoma's Insurance Holding Company Systems Act and by using the bond portfolio as collateral, thereby making the bond portfolio a non-admitted asset of Park Avenue and thereby immediately rendering Park Avenue insolvent.

97.     The Lancasters, Schindler, Schmeltzle and Thomas further breached fiduciary duties owed to Park Avenue by having conflicting interests to those of Park Avenue and taking advantage of their positions of trust and confidence.

98.     The Lancasters, Schindler, Schmeltzle and Thomas knew or should have known that transferring Park Avenue's bond portfolio to Oppenheimer in advance of the closing of the sale would allow the use of the bond portfolio as collateral for the loan, which would in turn allow PAI to purchase Park Avenue with Park Avenue's own money and, thereby, rendering Park Avenue/Park Avenue instantly insolvent.

99.     The Lancasters, Schindler, Schmeltzle and Thomas looted Park Avenue by the fraudulent transfer of the bond portfolio from Park Avenue to PAI and took advantage of their positions by obtaining millions of dollars from the subject transfer.

100.    As a result, Park Avenue has suffered damages of approximately $102 million.

## NEGLIGENCE PER SE – ALL DEFENDANTS

101.    Park Avenue incorporates by reference the allegations in all preceding paragraphs, and further alleges and states:

102.    Pursuant to OKLA. STAT. tit. 36,   § 1653(A), no person shall enter into an agreement to merge with or otherwise to acquire control of a domestic insurer unless, such person has filed with the insurance commissioner a statement containing certain information and the agreement or acquisition has been approved by the Commissioner.

103.    As part of the statement, § 1653(B)(2) mandates the disclosure of the source, nature and amount of the consideration used or to be used in effectuating the transaction, a description of any transaction wherein funds were or are to be obtained for any such purchase, and the identity of persons furnishing such consideration.

104.    Defendants violated § 1653 by failing to disclose the true source of financing for the transaction wherein all the issued and outstanding capital stock of Park Avenue was sold to PAI.

105.    Defendants further violated § 1653 in that the statement did not reflect the financial realities of the subject transaction, materially overstated Park Avenue's assets and understated its liabilities, concealed the true condition of Park Avenue's receivables, and excluded certain assets.

106.    As a result of Defendants' respective independent and collective failures to disclose the information mandated by statute, the OID was unable to properly evaluate the transaction, which resulted in the Insurance Commissioner entering an Order approving the

transaction without being aware that the sale of Park Avenue was being financed with Park Avenue's own assets.

107.    Pursuant to OKLA. STAT. tit. 36, § 1655(b), the Insurance Commissioner's prior written approval is required for transactions between a domestic insurer and its affiliates, including sales, purchases and exchanges.

108.    Defendant violated § 1655(b) by failing to obtain pre-approval in writing from the Insurance Commissioner for the transfer of Park Avenue's bond portfolio to PAI.

109.    As a result, Defendants' transfer of the bond portfolio was subsequently avoided by the Receiver as a fraudulent transfer because Park Avenue received no consideration from the transfer of the bond portfolio to PAI.

110.    The violations of § 1653 and § 1655 by failing to disclose the proper information to the OID and failing to obtain prior approval for the subject transfer ultimately caused Park Avenue to become insolvent.

111.    Therefore, Defendants were negligent *per se* for violating the aforementioned statutes and, as a result, Park Avenue has suffered damages totaling an estimated $102 million.

### NEGLIGENCE & BREACH OF FIDUCIARY DUTIES – OPPENHEIMER & ITS DIRECTORS AND OFFICERS

112.    Park Avenue incorporates by reference the allegations in all preceding paragraphs, and further alleges and states:

113.    Oppenheimer's Directors and Officers each owe a duty to Oppenheimer's clients to supervise the management of Oppenheimer's business and affairs to ensure that Oppenheimer and its employees act with the highest standards of ethical conduct.

114.    Oppenheimer's Corporate Governance Guidelines require Oppenheimer's Board of Directors and Officers to, among other things, act in the best interests of its investors,

approve major transactions, monitor compliance with the Code of Business Conduct and Ethics and satisfy itself as to the integrity of its senior management.

115.   Oppenheimer's Directors and Officers failed to properly supervise the management of Park Avenue's accounts and assets and failed to ensure that Reichman and Oppenheimer managed Park Avenue's assets ethically.

116.   Oppenheimer and its Directors and Officers owe a duty to, among other things, implement, maintain, exercise and enforce a strong effective system of internal controls to safeguard and preserve its clients and investors and their assets.  The internal controls are, according to Oppenheimer's Code of Conduct and Business Ethics for Directors, Officers, and Employees, supposed to be designed to ensure that business transactions are properly authorized and carried out, and that all reporting is truthful and accurate.   They further guarantee that all business transactions receive pre-closing authorization from an appropriate management level.

117.   Oppenheimer and its Directors and Officers failed to implement, maintain, exercise and/or enforce sufficient internal controls to ensure that its business and affairs were conducted ethically with regards to Reichman and Oppenheimer's handling of Park Avenue's accounts and assets, and Oppenheimer and its Directors and Officers failed to safeguard and preserve Park Avenue's assets as a result.

118.   Oppenheimer's Directors and Officers should have monitored, supervised and discovered the imprudent, negligent, and unlawful activities of Reichman and Oppenheimer with regards to Park Avenue's accounts and assets and ensure that Park Avenue's accounts and assets were handled properly and protected.

119.    As a result of the Directors' and Officers' respective negligent acts and omissions and breaches of the fiduciary duties owed to Park Avenue, Park Avenue suffered damages of approximately $102 million.

### CIVIL CONSPIRACY – ALL DEFENDANTS

120.    Park Avenue incorporates by reference the allegations in all preceding paragraphs, and further alleges and states:

121.    Oklahoma law imposes civil conspiracy liability on persons or entities that in combination do an unlawful act, or do a lawful act by unlawful means.

122.    Co-conspirator Antonucci pled guilty to criminal activity in *U.S. v Antonucci*, Case No. 10 Cr. (S.D.N.Y.). As part of his plea, Antonucci admitted to a scheme with others wherein he agreed to purchase Park Avenue by fraudulent means by the unlawful use of Park Avenue's own assets to leverage the transaction. Antonucci's plea also included his admission that he caused false information regarding the purchase to be submitted to the OID; misrepresented his net worth; and caused Park Avenue to submit a false financial statement to the OID. At all times material to this action, the Lancasters, Schindler, Thomas, Reichman, Antonucci, Oppenheimer and Oppenheimer's Directors and Officers participated in a civil conspiracy among themselves and with other persons known and unknown to allow the unlawful purchase of Park Avenue through unlawful means, including:

      a.  Participating in acts that furthered the purchase of Park Avenue with its own assets,

      b.  Participating in and allowing others to transmit false statements and misrepresentations to ensure that the transaction took place, and

      c.  Acting in concert to violate Oklahoma law and regulations.

123. Each Defendant is jointly and severally liable for the torts of the other members of the conspiracy, including co-conspirator, Antonucci.

124. As a result, Park Avenue has suffered damages totaling approximately $102 million.

## TRESPASS TO CHATTEL AND/OR CONVERSION –
## OPPENHEIMER, THE LANCASTERS AND SCHINDLER

125. Park Avenue incorporates by reference the allegations in all preceding paragraphs, and further alleges and states:

126. Oppenheimer, Schindler and the Lancasters were advised that the transfer of Park Avenue's bond portfolio to PAI was unlawful and voided as a matter of law and, therefore, the bond portfolio should have never been margined.

127. The Commissioner notified Oppenheimer, Schindler and the Lancasters that the transfer of the bond portfolio from Park Avenue to PAI had been avoided, that the bond portfolio never belonged to PAI, and that Oppenheimer and PAI had no right to use the bond portfolio as collateral for the loan to PAI.

128. Oppenheimer liquidated the portfolio to pay itself back for its loan to PAI.

129. The Lancasters and Schindler wrongfully retained millions of dollars that was paid to them for the purchase of the stock of Park Avenue.

130. The Receiver demanded that Oppenheimer return Park Avenue's entire bond portfolio that Oppenheimer had improperly transferred to PAI and then improperly used as collateral for the loan to PAI. The bond portfolio was, as a matter of law, never an asset of PAI and should have never been used as collateral by Oppenheimer.

131. The Receiver further demanded that the Lancasters and Schindler return the money paid to them as a result of the subject transaction.

21

132.    Oppenheimer, Schindler and the Lancasters refused and continue to refuse to return the money they absconded from Park Avenue's bond portfolio, thereby interfering with Park Avenue's right of possession of its bond portfolio and preventing Park Avenue from having access to its assets.

133.    As a result, Park Avenue has suffered damages totaling approximately $102 million.

### PUNITIVE DAMAGES

134.    Park Avenue incorporates by reference the allegations in all preceding paragraphs, and further alleges and states:

135.    Due to Defendants' respective individual and collective intentional, malicious and egregious acts, Park Avenue is entitled to an award of punitive/exemplary damages.

### CONCLUSION

WHEREFORE, Plaintiff, State of Oklahoma, *ex. rel.* Kim Holland, Insurance Commissioner for the State of Oklahoma, as Receiver for Park Avenue Property and Casualty Insurance Company f/k/a Providence Property and Casualty Insurance Company respectfully request that judgment be entered against each and every Defendant and in favor of Park Avenue in amount to be proven at trial; that Park Avenue be awarded pre-judgment and post-judgment interest; that Park Avenue be awarded its attorneys' fees; that the Court tax all costs, including discretionary costs, against Defendants; that Park Avenue be awarded such other, further and general relief as the Court deems just and proper.

Respectfully submitted,

**RHODES, HIERONYMUS, JONES,
TUCKER & GABLE, P.L.L.C.**

ANDREW D. DOWNING (OBA #16414)
BRADLEY S. SHELTS (OBA #19568)
KERRY R. LEWIS (OBA #16519)
100 W. Fifth Street, Ste. 400
ONEOK Plaza
P.O. Box 21100
Tulsa, Oklahoma 74121-1100
Telephone: 918/582-1173
Fax: 918/592-3390
adowning@rhodesokla.com
**ATTORNEYS FOR PLAINTIFF**

23